UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE


BUSINESS PAYMENT SYSTEMS, LLC, and
MERCHANT CAPITAL PORTFOLIOS, LLC                                    PLAINTIFFS


v.                                         CIVIL ACTION NO. 3:10-CV-00669


NATIONAL PROCESSING COMPANY, *et al.*                              DEFENDANTS


**<u>MEMORANDUM OPINION</u>**


This matter is before the court on three motions: (1) a motion by Defendants National

Processing Company, RPSI, Inc., and Fifth Third Processing Solutions, LLC, to dismiss Plaintiffs'

first amended complaint for failure to state a claim (DN 55); (2) a motion by Defendant National

Processing Management Company, Inc., to dismiss for misjoinder and failure to state a claim (DN

67); and (3) a motion by Plaintiffs Business Payment Systems and Merchant Capital Portfolios to

strike a third-party complaint filed by Defendants National Processing Company, RPSI, Inc., and

Fifth Third Processing Solutions, LLC (DN 83).

**I**

The court begins with a review of the first amended complaint filed by Plaintiffs

Business Payment Systems ("BPS") and Merchant Capital Portfolios ("Merchant Capital"). The

dispute in this case arises out of a marketing agreement that BPS and National Processing

Company ("NPC") initially entered into in 2000. NPC was a processor of credit and debit card

transactions. In the card transaction processing business, the processor is compensated for

performing its functions by the merchants who need their card transactions processed. Each

merchant pays the processor at a set rate – the "merchant rate" – that varies as to the individual merchant. BPS was an independent sales organization/member service provider ("ISO/MSP"), which functions as a marketer for processors. The ISO/MSP finds merchants to apply to the processor to have their card transactions processed by the processor. The processor then reviews the applications for approval in accordance with its own standards.

The 2000 marketing agreement between BPS and NPC provided for BPS to solicit prospective merchants exclusively for NPC.[1] The agreement also set forth the compensation that BPS was entitled to receive from NPC for successfully soliciting merchants. That compensation, called "residuals," was determined by the difference between two rates: the merchant rate that merchants paid to NPC and what is called the "ISO/MSP rate." Thus, if the merchant rate charged to a particular merchant was seven cents per dollar of card transactions and the ISO/MSP rate was four cents per dollar, BPS would be entitled to three cents per dollar of transactions.

Plaintiffs allege that at some point prior to March of 2004, NPC began to "systematically withhold[] Residuals from BPS." BPS supposedly protested the improper withholding of residuals in "written and oral" communications, "including emails," to officers of NPC.

In 2004, Bank of America acquired NPC and began operating the company under the name BA Merchant Services ("BAMS"). Plaintiffs claim that BPS continued to protest, orally and in writing, the alleged improper withholding of residuals after the acquisition. BPS

---

[1] Although Plaintiffs did not attach the marketing agreement to their complaint, Defendants tendered a copy of the agreement with their motion to dismiss. Because the marketing agreement is referred to in Plaintiffs' complaint and is central to certain of Plaintiffs' claims, the court may consider the marketing agreement when deciding the motion to dismiss for failure to state a claim. *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997).

ultimately filed a lawsuit against BAMS, raising, *inter alia*, claims that BAMS breached the marketing agreement and applicable industry standards and customs.

Plaintiffs' complaint states that in September of 2006, Bank of America sold BAMS to defendants Iron Triangle Payment Systems LLC ("Iron Triangle"), a subsidiary of defendant GTCR, LLC ("GTCR") and the "alter-ego" of defendant RPSI, Inc. ("RPSI"). Supposedly, the managers of Iron Triangle were the same managers as the ones who ran NPC before Bank of America purchased it. Iron Triangle changed the name of the processing company back to National Processing Company.

Plaintiffs allege that after the sale of NPC to Iron Triangle, NPC was "placed on notice of the existence of the BPS-BAMS Lawsuit" and knew that BPS potentially could raise similar claims against NPC. Indeed, Plaintiffs state, NPC entered an agreement with BPS to avoid being joined as a defendant in the BPS-BAMS lawsuit; the agreement required NPC to "negotiate in good faith over NPC's alleged improper grabs and other improper withholding of Residuals from BPS on an ongoing basis." However, NPC supposedly never entered into good faith negotiations nor did it cure its alleged improper breaches of the marketing agreement and applicable industry standards.

In August of 2009, NPC sued BPS. That lawsuit resulted in a settlement agreement dated August 29, 2009.[2] The settlement agreement provided, among other things, that it was to remain confidential. The settlement also provided that the parties would "exchange a full Release and Waiver of all claims between the parties based on actions or conduct occurring prior to the

---

[2] As with the marketing agreement, the defendants have provided the court with a copy of the settlement agreement and the court will consider that document because it is referred to in Plaintiffs' complaint and is central to certain of Plaintiffs' claims. *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997).

effective date of this agreement," other than certain "BPS preserved claims." The BPS preserved claims were defined as those claims "which mirror the specific claims regarding which Judge Simpson denied defendant's motion to dismiss/for summary judgment" in the BPS-BAMS litigation. The settlement agreement provided that the BPS preserved claims could be brought against NPC only after a final resolution of the BPS-BAMS litigation.

The settlement agreement also contained various provisions relating to a prospective sale by BPS of residual rights under the marketing agreement to a third-party. Those provisions included that NPC would not exercise its contractual "right of first refusal" for any prospective purchaser for 60 days. In addition, NPC was required to pay BPS the full amount of residuals for July, August, and September 2009. NPC was also required to engage in good faith negotiations with BPS to resolve within 10 days any revisions to the marketing agreement that a prospective purchaser sought. NPC agreed that it would not unreasonably withhold its consent to such modifications, and that disagreements as to reasonableness would be submitted for arbitration.

The August 2009 settlement agreement also referenced an ongoing dispute between BPS and BPS Rocky Mountain and BPS Worldwide, which the settlement agreement deemed "Terminated NPC-BPS Merchant Originators."[3] Specifically, the settlement agreement provided that BPS, with the consent of BPS Worldwide and BPS Rocky Mountain, could directly pay any merchant originators that were responsible for merchants "boarded" through BPS Worldwide and BPS Rocky Mountain. The amount of residuals that would have been paid to BPS Rocky Mountain and BPS Worldwide would be held in escrow while BPS engaged in good faith negotiations with those parties, with the backdrop that BPS would be required to submit its

---

[3] The complaint and settlement agreement leave unclear the exact natures of the relationship and dispute between BPS and the Terminated NPC-BPS Merchant Originators.

disputes with BPS Rocky Mountain and BPS Worldwide to arbitration by October 15, 2009 if the parties did not resolve the dispute. In addition, the settlement agreement provided that NPC could contract directly with merchant originators whose agreements with BPS have been terminated, including BPS Rocky Mountain and BPS Worldwide.[4]

Plaintiffs allege that BPS breached the August 2009 settlement agreement in numerous ways. In particular, Plaintiffs allege that NPC: acted in bad faith to prevent a prospective sale from closing; "shorted BPS its share of Residuals" for July, August, and September 2009 by "concoct[ing] a ridiculous excuse that blamed the economy for the missing payments"; withheld historical residual data from prospective purchasers despite repeated requests for the information; and unreasonably withheld its consent to modifications of the marketing agreement that were requested by BPS and its prospective purchasers.[5] Plaintiffs contend that NPC's breaches led to prospective buyers declining to make offers, and ultimately led to BPS accepting a less favorable offer from Merchant Capital.

Plaintiffs also claim that NPC "defam[ed]" BPS to the merchant originators and encouraged them to withhold their consent for BPS to pay them directly, which in turn made BPS's residual portfolio less valuable to the prospective purchasers of BPS's assets with whom BPS was negotiating. NPC also allegedly contracted directly with BPS's active merchant originators, despite the settlement agreement's provision that NPC was allowed to contract

---

[4] The settlement agreement also provided, among other things, that BPS would not sue NPC unless and until there was a final determination of the BPS-BAMS lawsuit; that lawsuit settled in August 2010.

[5] Plaintiffs state that BPS did not submit to arbitration its dispute over NPC's alleged unreasonable withholding of consent, as required by the settlement agreement, because BPS had a limited time to close its deal with a prospective purchaser.

directly only with merchant originators who had been terminated by BPS; that, too, allegedly made BPS's residual portfolio less valuable for prospective buyers. Indeed, Plaintiffs allege, one prospective buyer actually declined to make a bid on BPS's asset portfolio after contacting BPS merchant originators only to find out that the merchant originators had signed contracts to solicit merchants directly for NPC, rather than for any prospective buyer of BPS's assets.

Plaintiffs further allege that NPC violated the confidentiality provision of the settlement agreement. In that regard, Plaintiffs claim that NPC "advised BPS Rocky Mountain and BPS Worldwide" that BPS was obligated to hold certain sums in escrow and work out its dispute with the Terminated NPC-BPS Merchant Originators, as well as to submit the dispute between those parties to binding arbitration if necessary. Plaintiffs state that NPC's supposed breach of confidentiality diminished BPS's negotiating position with the Terminated NPC-BPS Merchant Originators and further reduced the value of BPS's assets to potential buyers.

According to Plaintiffs' complaint, NPC acted in bad faith and its conduct functioned as a de facto exercise of the "right of first refusal" that NPC had waived for 60 days in the August 2009 settlement agreement. Plaintiffs allege that to induce BPS to sign the settlement agreement, NPC made intentional "misrepresentations" that it would perform its end of the bargain, thus rendering the settlement agreement unenforceable.

Despite NPC's alleged pervasive breaches of the settlement agreement, BPS completed a sale, by novation, of "most of its assets," including BPS's rights under the marketing agreement, to Merchant Capital in October 2009. Then, around November 2010, NPC was sold to Defendant Fifth Third Processing Solutions LLC ("Fifth Third"). Plaintiffs contend that NPC is a

"subsidiary division of Fifth Third," and that Fifth Third "has been actively involved in the business, management, supervision, and operations of NPC."[6]

Beyond the supposed breaches of the marketing agreement and the August 2009 settlement agreement detailed above, Plaintiffs allege a number of other supposedly improper actions on the part of NPC. For most of the supposed improprieties, Plaintiffs provide no timeframe as to when they occurred. Plaintiffs claim that NPC provided poor service to merchants and "goug[ed]" them by charging them higher rates than other processors. According to Plaintiffs, the gouging and provision of poor services led to merchant attrition, which in turn caused BPS to lose revenues. Plaintiffs also contend that NPC violated the marketing agreement by "arbitrarily and improperly charg[ing] BPS merchants excessive and unjustified fees," including "bogus PCI compliance fees." Plaintiffs state that those actions also led to BPS merchant attrition; alternatively, Plaintiffs claim that they are entitled to a share of those additional fees. Plaintiffs further allege that NPC improperly moved hundreds of merchants from BPS's account in NPC's computer system.

In addition, Plaintiffs claim that NPC engaged in tortious interference with various of BPS's contracts. Specifically, Plaintiffs claim that NPC entered into contracts with BPS merchant originators that were contractually bound to market exclusively for BPS. Plaintiffs also claim that NPC tortiously interfered with BPS's contracts with its merchants. Further, Plaintiffs claim that, at some point, BPS had entered into valid agreements with prospective purchasers of BPS's business or assets, including Gateway Payment Services and iPayment Inc., but NPC

---

[6] In their response to the motion to dismiss, Plaintiffs state that, after they filed the first amended complaint, Fifth Third changed its name to Vantiv LLC.

supposedly interfered with those agreements by unreasonably withholding its consent to BPS's transfer to those entities of its right and obligation under the marketing agreement.

Plaintiffs also allege that NPC "willfully and maliciously" defamed BPS in verbal and written form to various third persons. Plaintiffs claim that NPC's defamatory statements were "broadcast at various times from 2004 to 2010." The statements supposedly included that BPS was going out of business, was not paying its merchant originators properly, was not producing its "required minimums," and was not providing proper customer support, and that its merchant accounts were suffering from an unacceptable amount of attrition. Additionally, beginning prior to the August 2009 NPC-BPS settlement and running until NPC's sale to Fifth Third, NPC allegedly told persons associated with Fifth Third that BPS and its principals could not be trusted and were liars, cheaters, and thieves.

In Plaintiffs' first amended complaint, they identified 19 causes of action against the defendants based on the factual allegations detailed above. Specifically, Plaintiffs brought the following claims: two claims each for breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with contract and business relationships, and declaratory judgments, as well as claims for breach of fiduciary duty, promissory estoppel, conversion, unjust enrichment, judicial accounting, libel, slander, defamation per se, trade libel, and prima facie tort.

## II

NPC, RPSI, and Fifth Third (collectively "Defendants") have moved to dismiss Plaintiff's first amended complaint for failure to state a claim. Upon a motion to dismiss for failure to state a claim, a court "must construe the complaint in the light most favorable to

plaintiff" and "accept all well-pled factual allegations as true." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). To survive a motion to dismiss, the "complaint must contain either direct or inferential allegations respecting all material elements" of the offense. *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902 (6th Cir. 2009) (internal question marks ommitted). The complaint's "factual allegations must be enough to raise a right to relief above the speculative level" and must "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A plaintiff must provide more than "labels and conclusions," *Twombly*, 550 U.S. at 555, or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, a court considering a motion to dismiss can "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. After doing so, the court should determine whether the remaining well-pled factual allegations, assumed to be true, "plausibly give rise to an entitlement to relief." *Id.*

Defendants identify numerous grounds that they contend require dismissal of Plaintiffs' claims. The court will begin with Defendants' contention that neither Plaintiff has standing to bring the claims and will then turn to Defendants' argument that the pleadings are insufficient as to Fifth Third. After considering those arguments, the court will turn to Defendants' arguments concerning the individual counts of the complaint.

## A. Standing

Defendants argue that the pleadings do not provide a basis for finding that BPS and Merchant Capital have standing to bring this action. Defendants contend that when BPS

transferred its interests under the marketing agreement to Merchant Capital, BPS was left without standing to make claims against NPC under the agreement. At the same time, Defendants argue that the fact that Plaintiffs alleged that they were in a dispute with each other concerning which of them retained the right to sue NPC meant that both parties had nothing more than a "purely speculative" right to bring suit against Defendants. According to Defendants, neither BPS nor Merchant Capital has a right to bring this action until Plaintiffs' respective rights have been adjudicated. For their part, Plaintiffs argue that it is clear that "either one or the other or both of the two plaintiffs own all claims asserted in the First Amended Complaint," and NPC "should not be able to escape culpability by alleging that the parties have not established precisely which one of the two owns the ultimate right of recovery for claims arising during a particular time frame."

The court will deny Defendants' motion to dismiss for lack of standing. It is sufficient to note, at this stage of the litigation, that the complaint clearly shows that either BPS or Merchant Capital has standing to bring each of the claims in this action. Accepting the allegations in the complaint as true, there was an injury, allegedly caused by Defendants, to BPS, and the litigation will redress that injury. Either BPS retained the right to bring those claims or it sold the right to bring some or all of the claims to Merchant Capital.  Thus, for each claim, it cannot seriously be disputed that at least one of the two plaintiffs has constitutional standing to bring the claim. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992).

Notably, Plaintiffs alleged that they have entered into an agreement to jointly prosecute the claims in this case until they determine through a separate lawsuit which of them will ultimately be entitled to any damages recovered in this suit. Thus, no matter which of those two

entities ultimately retains the right to damages for any individual claim, it is clear that there is a live case-or-controversy between the joint Plaintiffs and Defendants. In other words, Defendants cannot avoid having to defend the claims simply because BPS and Merchant Capital are separately involved in a dispute over the assignation of BPS's assets to Merchant Capital.[7]

**B. The Claims Against Fifth Third**

Defendants contend that the complaint fails to state a claim against Fifth Third because, according to Defendants, NPC is a "separate and independent corporation" from its parent corporation, Fifth Third. Defendants continue that Kentucky law does not impose liability on parent corporations simply because the parent corporation owns the subsidiary. Nor, according to defendants, have Plaintiffs pled any reason to disregard the parent-subsidiary relationship and "pierce the corporate veil" in this case.

However, while it may ultimately prove true that NPC is a "separate and independent corporation" from Fifth Third, that fact is not drawn from the first amended complaint. Instead the complaint refers to NPC as a "subsidiary division" of Fifth Third, not a separate corporation. Thus, Defendants' contentions about whether or not Plaintiffs have adequately pled a "piercing the corporate veil" theory are inapposite at this point.

Defendants also note that under Kentucky law, a corporation that acquires another corporation generally does not assume the payment of any debts or liabilities of the corporation that was purchased. *See Pearson ex rel. Trent v. Nat'l Feeding Sys.*, 90 S.W.3d 46, 49 (Ky. 2002). However, the exceptions to that general rule include the situation "where the purchaser

---

[7] The court further notes that BPS and Merchant Capital state in their response to the motion to dismiss that they have settled their lawsuit and thus will now be able to take proper action to clarify which of them is bringing which claim against Defendants.

expressly or impliedly agrees to assume such debts or other liabilities." *Id.* Here, Plaintiffs

expressly alleged that "Fifth Third acquired all assets <u>and liabilities</u> of NPC" (emphasis added).

That allegation is sufficient to overcome Defendants' motion to dismiss. The court notes that the

complaint is, of course, subject to the provision of Rule 11 that statements in pleadings are made

"to the best of [an attorney's] knowledge, information, and belief, formed after an inquiry

reasonable under the circumstances."

**C. Claims Relating to the Settlement Agreement: Counts 2 and 12**

In their complaint, Plaintiffs allege that NPC breached the August 2009 NPC-BPS

settlement agreement in numerous ways. In fact, Plaintiffs state in their complaint, NPC

fraudulently induced BPS to enter into the August 2009 NPC-BPS settlement agreement by

intentionally misrepresenting that NPC would actually perform its end of the bargain under the

settlement agreement. In Count 2, Plaintiffs bring a claim for breach of the August 2009 NPC-

BPS settlement agreement**.** In Count 4, Plaintiffs claim that NPC violated the implied covenant

of good faith and fair dealing that arose from the August 2009 settlement agreement. And in

Count 12, Plaintiffs seek a declaratory judgment that NPC breached the settlement agreement.

Plaintiffs seek both damages under the settlement agreement as well as a declaration that the

agreement is null, void, and unenforceable.

Defendants argue that neither rescission nor damages are available for the claims

premised on the supposed breaches of the settlement agreement. First, Defendants contend that

rescission of the 2009 settlement agreement is inappropriate because BPS waived its right to

seek rescission by performing the agreement and accepting its benefits. Defendants also contend

that rescission would be inappropriate because it would be impossible to restore the parties to

their status quo ante positions since BPS has now sold its assets to Merchant Capital. As to

BPS's claim for damages, Defendants argue that BPS waived any right to seek damages for

breach of the settlement agreement because BPS was aware of the breaches at the time the

contract was still executory, but BPS chose to perform under the agreement anyway by selling its

assets to Merchant Capital.

In Kentucky, courts apply the following rule concerning the appropriate recovery in

fraudulent inducement to contract cases:

> Where fraud has been committed in the obtaining of a contract, it may be taken
> advantage of in two forms: (1) By an affirmance of the contract and a recovery of
> damages for the injury; (2) by a disaffirmance of the contract and a recovery of
> the thing parted with as the consideration. By the latter, the contract is treated as a
> nullity. This mode can only be adopted upon certain terms; those terms are: That
> he surrender or tender a surrender within a reasonable time to the other
> contracting party the thing which he has received under the disaffirmed contract.
> He is not permitted to hold on to the thing which he has received and successfully
> effect a restoration of the thing which he has parted with under the contract.

*Grant v. Wrona*, 662 S.W.2d 227, 230 (Ky. Ct. App. 1983) (quoting *Webb v. Verkamp Corp.*,

254 S.W.2d 717, 719 (Ky. 1953).

Here, by its very terms, the August 2009 settlement agreement was designed to "facilitate

[a] Prospective Transaction" in which BPS would sell its right to residuals under the marketing

agreement to a third-party. According to the complaint, NPC nearly immediately began to breach

the terms of the agreement. However, rather than disaffirming the contract, BPS completed a sale

of its assets to Merchant Capital in October 2009, thus fulfilling the stated goal of the contract.

Because BPS sold its assets, even after NPC supposedly repeatedly breached the contract, the

court concludes that BPS affirmed the contract and rescission is inappropriate.

Alternatively, the inability to place the parties in a status quo ante position renders rescission inappropriate. Rescission of a contract "will not be allowed even for a substantial breach unless the former status of the parties can be restored." *C.C. Leonard Lumber Co. v. Reed*, 236 S.W.2d 961, 962 (Ky. 1951).

> To state a cause of action for rescission of contract, a plaintiff must establish that the parties can be placed in status quo ante and has the burden of proving that the status quo may be restored and that he or she has restored, or offered to restore, the other party to the status quo ante. Rescission is generally not available where the parties' condition as it existed prior to bargaining cannot be restored. However, in equity a contract may be rescinded although the parties cannot be placed in status quo, where the equities between the parties can be balanced.

*Francis v. Nami Res. Co., LLC*, 2008 WL 852047, at *15 (E.D.Ky. Mar. 28, 2008) (quoting 17B CJS Contracts § 488). Here, the allegations in the complaint make clear that returning the parties to any sort of status quo ante position is impossible. Rather than seeking to rescind the settlement agreement upon learning of NPC's alleged breaches, BPS decided to sell its assets to Merchant Capital. The court is at pains to see how the "equities" between BPS and NPC can be "balanced" after BPS sold its assets to a third-party, which assumed BPS's loan obligations in return.

However, the court does not agree that the allegations in the complaint make clear that Plaintiffs' claim for damages was waived by BPS's sale of assets. Defendants cite a rule that in a fraud case, if the defrauded party discovers the deceit before either party has substantially performed, but nonetheless affirms the contract, the party cannot sue for damages for the fraud. *See Hopkins v. Performance Tire & Auto Serv. Ctr., Inc.*, 866 S.W.2d 438, 441 (Ky. Ct. App. 1993). Here, although Plaintiffs allege that the contract was fraudulently induced, they do not seek damages for fraud, but only for breaches of the contract. Defendants have cited no case law

- 14 -

suggesting that a parties' performance of a contract procured through fraud waives claims for damages for breach of the contract.

The court also notes that Plaintiffs' claim for damages premised on NPC's alleged breach of the implied duty of good faith and fair dealing with respect to the implementation of the settlement agreement is not subject to dismissal. A duty of good faith and fair dealing runs with all contracts. *Ranier v. Mount Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991). To show a violation of the implied covenant of good faith and fair dealing, "the party asserting the violation must 'provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties.'" *O'Kentucky Rose B. Ltd. P'ship v. Burns*, 147 F. App'x 451, 457-458 (6th Cir. 2005) (quoting 23 RICHARD A. LORD, WILLISTON ON CONTRACTS § 63:22 (4th ed. 2004). Defendants do not argue that Plaintiffs have not properly pled a claim for breach of the implied duty of good faith and fair dealing; thus, the court will not dismiss that claim.

In short, the court will dismiss Plaintiffs' claim for rescission of the settlement agreement, but will otherwise decline to dismiss Counts 2, 4, and 12.

D. Claims Relating to Breaches of the Marketing Agreement: Counts 1, 3, and 11

Plaintiffs bring three counts related to supposed breaches of the marketing agreement. In Count 1, Plaintiffs claim:

> NPC committed multiple, intentional and malicious breaches of the Marketing Agreement, including, but not limited to failing to turn over 100% of the Residuals owed to BPS, failing to perform in accordance with standards generally accepted in the bankcard industry, failing to approve merchant applications in a timely and industry-accepted manner, charging excessive rates to merchants, failing to address BPS's reasonable re-pricing requests and by increasing prices for membership reward cards, all in an attempt to deprive BPS of the benefit of its bargain under the contract.

- 15 -

In Count 3, Plaintiffs assert that NPC violated the implied duty of good faith and fair dealing in connection with the marketing agreement. And in Count 11, Plaintiffs seek a declaratory judgment that NPC breached the marketing agreement and that Plaintiffs are no longer required to honor their obligations to NPC under the marketing agreement.

A. Underpayment of Residuals

The court begins with the Plaintiffs' claim for breach of contract based on underpayment of residuals. The 2009 settlement agreement between BPS and NPC stated that the parties would exchange a release and waiver of all claims based on conduct prior to the effective date of the settlement agreement except those that the agreement deemed "BPS preserved claims." Defendants do not dispute that the claim for underpayment of residuals constituted a BPS preserved claim, and thus survived the settlement agreement. Instead, Defendants contend that the claim for underpayment of residuals should be dismissed because Plaintiffs failed to allege that they complied with a condition precedent to their claim. Paragraph 7 of the marketing agreement provides:

> Adjustments. All debits and credits to ISO/MSP covered by this Agreement shall be subject to audit and final checking by NPC and Bank. ISO/MSP is responsible for verifying their monthly Residual reports and records for various debits and credits made pursuant to this Agreement, and for promptly notifying NPC and Bank of any perceived errors whether to ISO/MSP's benefit or to NPC's or Bank's benefit. Errors must be reported by ISO/MSP within ninety (90) days of occurrence to be subject to adjustment.

Paragraph 19 provides that "[a]ll notices and other communications required or permitted under this Agreement shall be in writing and given by personal delivery, telecopy (confirmed by a mailed copy) or first-class mail." Defendants argue that Plaintiffs' claim for underpaid residuals

- 16 -

must be dismissed because BPS never provided notice to NPC in the manner stated in paragraph 19.

Plaintiffs make three arguments in response. First, Plaintiffs state that they provided Defendants with actual notice of BPS's claims of underpayment of residuals, including via written emails to officers at NPC. Second, Plaintiffs argue that "whether paragraph 19 applies to the types of notices contemplated within paragraph 7" and whether email messages may constitute written notice under the agreement due to the parties' course of conduct are questions for a jury, not the court. Third, Plaintiffs argue that the doctrine of "unclean hands" prevents NPC from arguing that BPS violated a provision of the marketing agreement.

The court begins with Plaintiffs' second argument concerning the interpretation of the contract. It is "axiomatic that interpretation of a contract is an issue of law for the court." *Harrodsburg Indus. Warehousing, Inc. v. MIGS, LLC*, 182 S.W.3d 529, 532 (Ky. Ct. App. 2005). And, when a contract is unambiguous, it must be enforced strictly according to its terms. *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003). Courts interpret the terms "by assigning language its ordinary meaning and without resort to extrinsic evidence." *Id.*

The terms noted above are unambiguous. Paragraph 7 required BPS to provide notice of errors within 90 days of the receipt of a monthly residual report. Paragraph 19 states how "[a]ll notices or other communications," whether "required or permitted under" the marketing agreement, shall be made. The plain words of paragraph 19 clearly encompass the notice required under paragraph 7 for errors. Additionally, paragraph 19 is clear concerning the manner in which notice must be provided, i.e., that it must be provided via "personal delivery, telecopy (confirmed by a mailed copy) or first-class mail." Plaintiffs do not provide the court with any

interpretation of those two contract provisions that would otherwise make sense. Because there is no ambiguity in the contractual provisions requiring written notice of errors in computing residuals via personal delivery, telecopy confirmed by a mailed copy, or mail within ninety days of receipt of the monthly residual report, the court is precluded from considering extrinsic evidence about how the parties actually provided notice during their course of dealings. *See Frear*, 103 S.W.3d at 106; *Davis v. Siemens Med. Solutions USA, Inc.*, 399 F. Supp. 2d 785, 792 (W.D.Ky. 2005) ("Under Kentucky law, . . . the Court cannot reference extrinsic facts or aids to determine the meaning of an unambiguous contract.").

Having found that the contract is clear that written notice of alleged underpayments of residuals must be provided via personal delivery, telecopy, or mail, the court turns to the question of whether the allegations in the complaint are sufficient to show compliance with the contract's notice provisions. To state a claim for breach of contract, a plaintiff must allege that it has complied with all conditions precedent. *Sara Lee Corp. v. Litton Indus. Automation Sys., Inc.*, 1992 WL 22693, at *2 (N.D.Ill. Feb. 6, 1992). Federal Rule of Civil Procedure 9(c) provides a minimum standard for alleging performance of conditions precedent: "it suffices to allege generally that all conditions precedent have occurred or been performed."

Here, Plaintiffs did not make a general allegation that BPS performed the conditions precedent to recovery under the contract, as Rule 9(c) entitled them to do if they wished. Rather, Plaintiffs specifically alleged that BPS "protested immediately" upon realizing that NPC was underpaying it and that BPS repeatedly informed NPC in "both written and oral" communications about the purported underpaying of residuals. However, the only form of written communication that BPS specified in the complaint was "email." As noted above, the

marketing agreement required notice by personal delivery, telecopy, or mail. Because Plaintiffs failed to allege that they provided notice in the manner required by the marketing agreement, Plaintiffs have failed to state a claim for breach of contract based on the alleged underpayment of residuals. *See Sara Lee Corp.*, 1992 WL 22693, at *2 (dismissing claim where failure to comply with conditions precedent was apparent from the face of the complaint and attachments); *East River Constr. Corp. v. Dist. of Columbia*, 183 F. Supp. 684, 685 (D.D.C. 1960) ("This requirement of written notice is a condition precedent to recovery; it not having been alleged, the count is defective and must be dismissed.").

Lastly, there is no merit to Plaintiffs' argument that the doctrine of "unclean hands" bars NPC from claiming that BPS violated the notice requirement of the contract. The "unclean hands" doctrine is an "equitable defense" that precludes a party from judicial relief "if that party 'engaged in fraudulent, illegal, or unconscionable conduct' in connection 'with the matter in litigation.'" *Mullins v. Picklesimer*, 317 S.W.3d 569, 577 (Ky. 2010) (quoting *Suter v. Mazyck*, 226 S.W.3d 837, 843 (Ky. App. 2007)). Here, it is Plaintiffs, and not NPC, seeking judicial relief. Plaintiffs point to no case suggesting that a defendant cannot raise a valid defense due to the "unclean hands" doctrine. Thus, the court finds that the unclean hands doctrine is inapplicable. The claim for breach of the marketing agreement based on underpayment of residuals will be dismissed.

B. The Other Contract Claims

*1. The Effect of the August 2009 Settlement Agreement*

Defendants contend that, unlike the claim for breach of contract based on the underpayment of residuals, the other contract claims were not designated "BPS preserved

claims" in the 2009 settlement agreement. Thus, Defendants claim that, to the extent those claims arose before August 2009, they are barred by the settlement agreement. Plaintiffs urge that the settlement agreement did not itself constitute a release and waiver of the claims. Plaintiffs point out that the settlement agreement instead stated, "The parties will exchange a full Release and Waiver of all claims based on any conduct which occurred prior to the effective date of this Settlement Agreement (except the 'BPS preserved claims'. . . )." Plaintiffs argue that the settlement agreement only constituted an agreement to later exchange a release. Plaintiffs further state that NPC has not presented any evidence that BPS ultimately signed an enforceable release.

Under Kentucky law, preliminary agreements are subject to an "all or nothing approach": they are either "enforceable as a binding contract to consummate the transaction" or are "unenforceable as something less." *Cinelli v. Ward*, 997 S.W.2d 474, 478 (Ky. Ct. App. 1998). "To be enforceable and valid, a contract to enter into a future covenant must specify all material and essential terms and leave nothing to be agreed upon as a result of future negotiations." *Walker v. Keith*, 382 S.W.2d 198, 201 (Ky. 1964). Thus, the agreement to enter a future contract must either leave no material terms unresolved or else supply a "definite method of ascertaining" the material terms. *Cinelli*, 997 S.W.2d at 477-478.

Here, the provision of the settlement agreement requiring the parties to enter into a release and waiver of all claims arising from conduct that occurred prior to the effective date of the settlement agreement was sufficiently definite to constitute a binding contract to consummate that release and waiver. Specifically, it provided:

> The parties will exchange a full Release and Waiver of all claims based on any conduct which occurred prior to the effective date of this Settlement Agreement (except the "BPS preserved claims" which BPS has asserted it has against NPC,

as described in the following paragraph), which Release and Waiver will inure to the benefit of the parties, their principals, affiliates, officers, directors, etc.

In the following paragraph, the BPS preserved claims were described in acute detail:

> The "BPS preserved claims" are strictly limited to claims which mirror the specific claims regarding which Judge Simpson denied defendant's motion to dismiss/for summary judgment in his Memorandum Opinion dated July 25, 2007 in *Business Payment Systems, LLC v. BA Merchant Services,* LLC, Civil Action No. 3:06CV-378-S (e.g. "that [Processor] breached the Marketing Agreement by failing to turn over 100% of the Residuals owed to BPS, failing to perform in accordance with standards generally accepted in the bankcard industry . . . [and thereby] breached the duties of good faith and fair dealing").

The provision continued that the BPS preserved claims could be brought against NPC only after a final judgment or settlement in BPS's case against BAMS.

Thus, the settlement agreement was specific and clear about what claims were to be released, what claims would not be released, what parties would benefit from the release, and even when the claims could be asserted against NPC. Because all material and essential terms of the release were provided for in the agreement to enter the release, and there was nothing to be agreed upon through future negotiations, the settlement agreement constituted a valid agreement to contract for the release of the claims and should be enforced as such.[8] Accordingly, to the extent that BPS's claims for breach of the marketing agreement – other than the underpayment of residuals claim addressed above – are based on actions prior to the effective date of the settlement agreement in 2009, those claims are not actionable.

---

[8] Plaintiffs also urge that the settlement release was invalid because of NPC's breaches of the settlement agreement. However, as explained above, rescission of the settlement agreement is not an available remedy in this case.

*2. The Provisions of the Marketing Agreement that Were Allegedly Breached*

Defendants also contend that Plaintiffs' other contract claims, even to the extent that they arose from NPC's actions after the effective date of the August 2009 settlement agreement, must be dismissed on the ground that Plaintiffs do not identify which contract provisions were actually breached. As noted above, the alleged breaches of contract, beyond the claim for underpayment of residuals discussed above, were that NPC: (1) "fail[ed] to perform in accordance with standards generally accepted in the bankcard industry"; (2) "fail[ed] to approve merchant applications in a timely and industry-accepted manner"; (3) "charg[ed] excessive rates to merchants"; (4) "fail[ed] to address BPS's reasonable re-pricing requests"; and (5) "increas[ed] prices for membership reward cards."

It is true that Plaintiffs do not specify in the complaint the exact provision of the marketing agreement that was allegedly breached by each of the above-enumerated actions. However, while the complaint does not explicitly identify which provisions of the marketing agreement that Plaintiffs believe NPC violated, in their response to the motion to dismiss Plaintiffs point to specific provisions of the marketing agreement that they argue encompass their claims for breach of contract.

Specifically, Plaintiffs point to amendment 4 to the marketing agreement, signed on August 16, 2004, section 5 of which provides, "NPC agrees to perform the services set forth in the Agreement in accordance with standards generally accepted in the bankcard industry." That provision would seem to encompasses Plaintiffs' allegation that NPC breached the marketing agreement by "failing to perform in accordance with standards generally accepted in the bankcard industry," perhaps along with other of Plaintiffs' claims of breach. However, that same

- 22 -

provision also provides that if "NPC should fail to meet said provision of service standards, then ISO/MSP's sole and exclusive remedy shall be the cooperation of NPC to schedule a meeting within ten (10) business days of ISO/MSP's written request to discuss the provision of services." Because Plaintiffs fail to plead compliance with a condition precedent–that BPS provided a written request to discuss the provision of services–and also fail to plead that NPC then refused to schedule a meeting, Plaintiffs' breach of the marketing agreement claims may not properly be premised on section 5 of Amendment 4 to the marketing agreement.

Plaintiffs also point to amendment 7 to the marketing agreement, which was signed in July 2007. Subsection f of section 6 of that amendment states that NPC would adhere to the service standards set forth in attachment 2 to the amendment. In turn, attachment 2 states that NPC was required to make a decision regarding merchant applications by the end of the business day following the date of submission for at least 97% of properly submitted applications. Plaintiffs argue that they properly alleged a breach of the marketing agreement by stating that NPC failed "to approve merchant applications in a timely and industry-accepted manner." But, section 6(f) states that if NPC failed to materially maintain those service standards, then "ISO/MSP will provide NPC with written notice of the alleged default specifically detailing the alleged default within ten (10) business days of the end of the month in which ISO/MSP believes such alleged default occurred," after which NPC would have 30 days to cure the default. Once again, Plaintiffs have not pled compliance with the conditions precedent to that claim: they did not plead that they provided the requisite written notice or that NPC had the opportunity to cure any alleged default. Thus, Plaintiffs are unable to premise their breach of contract claims on section 6(f) of amendment 7 to the marketing agreement.

However, the court finds that Plaintiffs have sufficiently stated a claim that NPC breached the marketing agreement by "charging excessive rates to merchants." Relative to that claim, Plaintiffs alleged that NPC charged "excessive and unjustified" fees to merchants for "PCI insurance coverage" that was either not actually provided to them or that was illegal. Plaintiffs contended that those excessive fees resulted in merchant attrition and thus damage to BPS. Alternatively, Plaintiffs alleged that if the fees were not excessive or unjustified, NPC "arbitrarily and improperly withheld BPS's share of these additional fees." As both parties note, BPS and NPC entered into an informal letter agreement in 2009 allowing NPC to assess fees to merchants that wished to participate in the PCI program. The fees that NPC was allowed to assess to the merchants were specified in the informal agreement–either $90 or $198 annually. In turn, for each participating merchant, NPC was to pay BPS a fee; the manner of calculating that fee was set out in the informal agreement. Thus, BPS's allegations that NPC either charged "excessive and unjustified" PCI fees or withheld BPS's share of such fees is sufficient to state a claim for breach of the explicit informal letter agreement.

Plaintiffs identify no further explicit provisions of the marketing agreement. Thus, excepting Plaintiffs' claim of charging excessive fees to merchants, Plaintiffs have failed to state a claim for breach of the marketing agreement.

*3. The Implied Covenant of Good Faith and Fair Dealing*

As noted above, Plaintiffs also brought a claim that NPC breached the implied covenant of good faith and fair dealing that ran with the marketing agreement. As noted above, the August 2009 settlement agreement provided for "BPS preserved claims" that would survived the release of claims contained therein. The BPS preserved claims were those that "mirror the specific

claims regarding which Judge Simpson denied defendant's motion to dismiss/for summary judgment in his Memorandum Opinion dated July 25, 2007 in *Business Payment Systems, LLC v. BA Merchant Services,* LLC, Civil Action No. 3:06CV-378-S." In that memorandum opinion, the court denied the motion to dismiss Count II, which alleged breach of the duty of good faith and fair dealing that runs with all contracts. Thus, BPS's claim in Count 3 alleging breach of the duty of good faith and fair dealing was not released by the settlement agreement and will not be dismissed.

**E. Breach of Fiduciary Duty: Count 5**

In Count 5, Plaintiffs assert a claim for breach of fiduciary duty. Specifically, Plaintiffs assert that NPC owed a fiduciary duty to BPS "by virtue of its position of trust and authority and control over the merchants" and "Residuals" under the marketing agreement. Plaintiffs contend that BPS violated the fiduciary duty by, among other things, "converting and withholding Residuals and other funds."

In the previous BPS-BAMS litigation, BPS brought a similar claim. This court dismissed the claim stating that BPS had not offered any authority for the proposition that a fiduciary duty arises out of the fact that one party has a position of "trust and authority and control over the selection of merchants." The court continued:

> By all accounts, these are sophisticated business entities who entered into an arms length, for-profit business relationship. Section 12 of the Marketing Agreement states that "[i]t is expressly understood that [Marketer], [Processor] and Bank are in all respects independent parties to this Agreement." There is no evidence that this relationship implicated a duty for Processor to act "primarily for [Marketer]'s benefit in matters connected with such undertaking."

*Business Payment Sys., LLC v. BA Merchant Servs., LLC*, 2007 WL 2174724, at *4 (W.D.Ky. July 25, 2007). The court thus dismissed BPS's breach of fiduciary duty claim.

Plaintiffs point to nothing that causes this court to change its analysis of the issue. The allegations in the complaint make clear that Plaintiffs and Defendants were sophisticated business entities that entered into arms-length commercial contracts. There is no basis for finding that Defendants owed Plaintiffs a fiduciary duty. Accordingly, Count 5 will be dismissed.

**F. Tortious Interference With BPS's Existing Business Relationships: Count 6**

In Count 6, Plaintiffs allege that NPC intentionally or recklessly interfered with BPS's contracts and relationships with its merchants and merchant originators. To state a claim for intentional interference with a business relationship, a plaintiff must plead: "(1) the existence of a valid business relationship or its expectance; (2) defendant's knowledge thereof; (3) an intentional act of interference; (4) improper motive; (5) causation; and (6) special damages." *Monumental Life Ins. Co. v. Nationwide Retirement Solutions, Inc.*, 242 F. Supp. 2d 438, 450 (W.D.Ky. 2003).

Defendants claim that BPS's allegations are insufficient to show improper motive on the part of NPC as to the alleged interference with BPS's existing business relationships. They contend that the allegations merely show that NPC acted to advance its own economic interests. In response, Plaintiffs point out that they specifically pled that NPC's actions were intentional and malicious. Plaintiffs also note that the August 2009 settlement agreement contained a provision by NPC not to contract with any "BPS Down Lines or Merchant Originators."

Initially, Plaintiffs' allegation that "NPC's intentional and unjustified conduct was motivated by ill will and malice" is nothing more than a conclusory recitation of an element of the cause of action. The court is not bound to accept that conclusory allegation in determining the motion to dismiss. *Iqbal*, 556 U.S. at 678-679. However, a reasonable inference could be

drawn that NPC acted with an improper motive in soliciting "BPS Down Lines or Merchant Originators" based on the fact that doing so was explicitly forbidden by the settlement agreement. Accordingly, the motion to dismiss will be denied as to this claim.

### G. Tortious Interference With BPS's Prospective Business Relationships: Count 7

In Count 7, Plaintiffs claim that NPC "willfully, intentionally and maliciously interfered" with BPS's agreements to sell its business or assets to third-parties. Defendants point out that, pursuant to the marketing agreement, it was NPC's right to withhold consent to prospective purchasers of BPS's business; accordingly, they argue that they are not subject to liability for exercising a contractual right. Defendants further argue that under the settlement agreement, NPC waived its right to withhold consent for 60 days, thus vitiating any claim that it unreasonably withheld consent during that time period.

The court will decline to dismiss the claim for tortious interference with BPS's prospective business relationships. NPC is correct that to prove a tortious interference with contract claim, a plaintiff must show that the interference was "malicious or without justification, or [was] accomplished by some unlawful means such as fraud, deceit, or coercion." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 487 (Ky. 1991). Accordingly, courts have found that where the evidence shows only that a defendant exercised a contractual right to withhold consent to an agreement between a plaintiff and a third-party, a tortious interference claim fails. *See Hunt Enters., Inc. v. John Deere Indus. Equip. Co.*, 18 F. Supp. 2d 697, 703 (W.D.Ky. 1997); *Nat'l Collegiate Athletic Assoc. v. Hornung*, 754 S.W.2d 855, 860 (Ky. 1988).

Nevertheless, Plaintiffs' complaint is sufficient to state a claim for tortious interference with its prospective business relationships. In particular, Plaintiffs allege that although NPC

waived its right of first refusal in the settlement agreement, NPC worked to frustrate BPS's potential sales and its actions doing so "were tantamount to exercising that very right." BPS further states that NPC, *inter alia*, refused to provide historical residual data to prospective purchasers and unreasonably withheld its consent to modifications of the marketing agreement requested by BPS and the prospective purchasers, despite that the settlement agreement required NPC to provide that data and to negotiate in good faith over proposed revisions to the marketing agreement. Those allegations allow for a reasonable inference that NPC interfered with BPS's agreements with such prospective purchasers, and that, by acting in intentional disregard for the settlement agreement, NPC did so maliciously. Accordingly, the motion to dismiss will be denied as to this claim.

### H. Promissory Estoppel: Count 8

Plaintiffs claim in Count 8 that NPC "made clear and unambiguous promises," both in the marketing agreement and collateral to the marketing agreement, to work with BPS in good faith. Plaintiffs state that BPS relied upon those promises, but NPC failed to keep them.

However, "[p]romissory estoppel is not a doctrine designed to give a party to a negotiated commercial bargain a second bite at the apple in the event it fails to prove breach of contract." *Gen. Aviation, Inc. v. Cessna Aircraft Co.*, 915 F.2d 1038, 1042 (6th Cir. 1990) (quoting *Walker v. KFC Corp.*, 728 F.2d 1215, 1220 (9th Cir. 1984)); *Shane v. Bunzl Distrib. USA, Inc.*, 200 F. App'x 397, 404 (6th Cir. 2006) (finding that although no Kentucky state court decision has addressed whether the principle that "a promissory-estoppel claim cannot be based upon a performance that is contractually required" applies in Kentucky, the Sixth Circuit believed that the Kentucky Supreme Court would adopt that "widely accepted principle"). Here,

there is no dispute that the marketing agreement was an express, enforceable contract. Moreover, the marketing agreement was entered into by two sophisticated commercial entities and explicitly stated in paragraph 22 that it "embodies the entire understanding and agreement of the parties hereto with respect to the subject matter hereof." Accordingly, Plaintiffs may not rely on the promissory estoppel doctrine, and Count 8 will be dismissed.

**I. Conversion: Count 9**

In Count 9, Plaintiffs bring a claim for conversion. Plaintiffs state that they have "possessory rights and interests in the Residuals and other sums controlled and improperly withheld and converted by NPC." Plaintiffs continue that they "have demanded the payment of their rightful share of the Residuals and other sums and NPC has refused and failed to make payment of the same." Defendants seek dismissal of the conversion claim as duplicative of the breach of contract claim.

In *Davis v. Siemens Medical Solutions USA, Inc.*, 399 F. Supp. 2d 785, 801 (W.D.Ky. 2005), the court stated that a "conversion claim does not lie [where] the property right alleged to have been converted arises entirely from the contractual rights to compensation." Because the plaintiff in that case simply sought "payment of a disputed debt," the court rejected his conversion claim and stated that "interpretation of the contract governs [his] entitlement to the disputed payments." *Davis*, 399 F. Supp. 2d at 801. Here, as noted above, the marketing agreement is an enforceable contract. Plaintiffs' conversion claim clearly relates only to monies Plaintiffs believe they are owed pursuant to that agreement. Thus, the court will dismiss Count 9.

**J. Unjust Enrichment: Count 10**

Plaintiffs claim in Count 10 that NPC has been "unjustly enriched at the expense of BPS and [Merchant Capital]." Plaintiffs state that "NPC obtained substantial benefits from the Services provided to it by BPS," but "has not properly compensated BPS and [Merchant Capital] for the full value of the Services received from BPS." However, "[t]he doctrine of unjust enrichment has no application in a situation where there is an explicit contract which has been performed." *Codell Constr. Co. v. Commonwealth*, 566 S.W.2d 161, 165 (Ky. Ct. App. 1977). Because it is clear that BPS performed any services for NPC pursuant to the marketing agreement–an explicit contract–the unjust enrichment claim will be dismissed.

**K. Judicial Accounting: Count 13**

In Count 13, Plaintiffs allege that "NPC is in exclusive control of all data concerning fees, rate structures, processing activity, Residuals and related financial information concerning the merchant accounts," as well as the same data in relation to "merchant accounts boarded by Merchant Originators which were contracted exclusively to BPS with whom [NPC] ha[s] tortiously interfered." Plaintiffs claim that they are entitled to a "judicial accounting of all the foregoing fees, rate structures, processing activity, Residuals and related financial information improperly converted and withheld by NPC from Plaintiffs."

"The necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is . . . the absence of an adequate remedy at law." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962). In *Dairy Queen*, the Supreme Court explained that in order to maintain a suit for an equitable accounting, "the plaintiff must be able to show that 'the accounts between the parties are of such a 'complicated nature' that only a court of equity can

satisfactorily unravel them." 369 U.S. at 478 (quoting *Kirby v. Lake Shore & M. S. R. Co.*, 230
U.S. 130, 134 (1887)). The Supreme Court continued:

> In view of the powers given to District Courts by Federal Rule of Civil Procedure
> 53(b) to appoint masters to assist the jury in those exceptional cases where the
> legal issues are too complicated for the jury adequately to handle alone, the
> burden of such a showing is considerably increased and it will indeed be a rare
> case in which it can be met.

*Id.* The Supreme Court noted that "[t]he legal remedy cannot be characterized as inadequate
merely because the measure of damages may necessitate a look into [a party's] business
records." *Id.* at 479.

Defendants argue that Plaintiffs have an adequate remedy at law–the breach of contract
claims. Because Plaintiffs will be entitled to discovery on what remains of those claims,
Defendants contend that the judicial accounting claim must be dismissed.

In *Oil Express Nat'l, Inc. v. Latos*, 966 F. Supp. 650, 652 (N.D.Ill. 1997), the court
dismissed a count seeking an equitable accounting for failure to allege that an adequate remedy
at law did not exist. In contrast, in *Holley Performance Prods., Inc. v. Keystone Auto.
Operations, Inc.*, 2009 WL 3613735, at *3-*4 (W.D.Ky. Oct. 29, 2009), the court declined to
dismiss a claim for an equitable accounting where the claimant, Keystone, made the following
allegation:

> Keystone's legal remedies, including the legal remedies that may be afforded to
> Keystone through discovery, are inadequate in this case. The accounts between
> Keystone and Holley are of such a complicated nature that it is necessary for a
> court of equity, or its specially appointed master, to unravel them. In other words,
> because of the nature of the relevant documents at issue in this case, there are
> circumstances of great complication or difficulties in the way of adequate relief at
> law.

In response to the argument of the opposing party, Holley, that a breach of contract claim would provide an adequate remedy at law, the court noted that the burden on the plaintiff at the motion to dismiss stage was only to allege that there was no adequate remedy at law, and that "[t]he determination of whether a legal remedy exists is more appropriate after commencement of discovery and upon filing of summary judgment motions." *Holley*, 2009 WL 3613735, at *3-*4.

Here, Plaintiffs have not alleged that there is no adequate remedy at law. Nor have Plaintiffs alleged that the accounts between the parties are of such a "complicated nature" that a court of equity is necessary to unravel them. Instead, the allegations in the first amended complaint state only that NPC is in "exclusive control" of the financial information at issue. As noted above, the Supreme Court stated in *Dairy Queen* that "[t]he legal remedy cannot be characterized as inadequate merely because the measure of damages may necessitate a look into [a party's] business records." *Id.* at 479. Because that is the sole basis in the complaint for Plaintiff's claim for an accounting, Count 13 must be dismissed.[9]

## L. Defamation Claims: Counts 14, 16, 17, 18, and 19

In Counts 14 through 20,[10] Plaintiffs bring various defamation-related claims: libel (Count 14); slander (Count 16); defamation per se (Count 17); trade libel (Count 18); and prima facie tort (Count 19). Defendants contend that these claims must be dismissed as barred by the statute of limitations.

---

[9] In their papers responding to the motion to dismiss, Plaintiffs state that they requested an accounting because they are "concerned that the legal remedies, including those remedies that may be afforded through discovery, are inadequate in this case." However, the complaint fails to make any allegation of that sort.

[10] There is no Count 15; the complaint skips from Count 14 to Count 16.

Kentucky law provides a one-year statute of limitations for defamation claims. KRS § 413.140(1)(d). The statute of limitations begins running when the defamatory statements were made. *Lashlee v. Sumner*, 570 F.2d 107, 109-110 (6th Cir. 1978); *Bielefeld v. Haines*, 192 F. App'x 516, 519 (6th Cir. 2006).

As an initial matter, Plaintiffs argue that Defendants should be estopped from relying upon the statute of limitations. Plaintiffs state that Defendants waived any statute of limitations defense. Plaintiffs alleged that NPC was made aware of BPS's lawsuit against BAMS concerning the withholding of residuals. Plaintiffs further alleged that, in order to avoid being added as a defendant in that suit, NPC entered into agreements with BPS to negotiate in good faith regarding the residual issue and to abide by the "ultimate final resolution" of the BPS-BAMS lawsuit "regarding the obligations of NPC to properly calculate and not withhold Residuals (*e.g.*, grabs) or otherwise engage in similar violations of the Marketing Agreement that BPS had alleged in the BAMS lawsuit." However, the court sees no reason that any alleged agreements between NPC and BPS concerning how the two parties would resolve BPS's claims that NPC was withholding residuals should toll the statute of limitations as to BPS's defamation claims against BPS.

Plaintiffs also argue that NPC fraudulently induced BPS to enter into the August 2009 settlement agreement, which, Plaintiffs state, forced them to delay the filing of their claims. Plaintiffs, citing paragraph 11 of the settlement agreement, contend that "[t]he language of the Settlement Agreement clearly indicates that the parties intended to have the statute of limitations tolled."

Paragraph 10 of the August 2009 settlement agreement states that the parties will exchange a full release and waiver of all claims based on any conduct which occurred prior to the effective date of the settlement agreement, except the "BPS preserved claims." Paragraph 11 then defined the "BPS preserved claims" as those which mirror the "specific claims regarding which Judge Simpson denied defendant's motion to dismiss/for summary judgment in" the BPS-BAMS action. Paragraph 11 continued, "The BPS preserved claims may be brought against NPC only after a final judgment has been entered in that case after exhaustion of all appeals, or after a settlement which finally resolves all of the case and results in its dismissal." The plain text of the settlement agreement makes clear that if the settlement agreement tolled the statute of limitations for any claims, it was only for the BPS preserved claims. Indeed, under the settlement agreement, the BPS preserved claims were the only claims that arose prior to its effective date that even survived. Because the defamation claims asserted in this action were not part of the BPS preserved claims, the court fails to see how the settlement agreement tolled the statute of limitations for any defamation claims.

In short, the complaint does not set forth sufficient allegations to toll the one-year statute of limitations for Plaintiffs' defamation-related claims. Plaintiffs filed the initial complaint in this action on October 26, 2010. Thus, it would appear that only statements made on or after October 26, 2009 are actionable.[11]

---

[11] Plaintiffs insist that statements that were made prior to October 26, 2009, are still actionable under the "republication" rule. In *Salyer v. S. Poverty Law Ctr.*, 701 F. Supp. 2d 912 (W.D.Ky. 2009), this court addressed the applicability of the republication rule. First, the court noted that it predicted Kentucky would follow the "single publication rule," which provides that a mass communication or aggregate publication is a single communication that gives rise to only one action for libel. *Salyer*, 701 F. Supp. 2d at 914. The republication rule is a "narrow exception to the single publication rule." *Id.* It provides that republishing earlier material in a new edition, with edits, or in continue...

Defendants then argue that it is clear from the complaint that any statements made by NPC about BPS were made prior to October 26, 2009. Defendants note that Plaintiffs' initial complaint alleged that BPS novated its assets to Merchant Capital on October 26, 2009,[12] and thus, to have caused any damage to BPS, the statements must have been made prior to that date.

However, Plaintiffs made sufficient factual allegations that at least some of NPC's statements were made after October 26, 2009. In particular, Plaintiffs alleged that NPC made statements to various persons about BPS and its principals during the time period leading "up to and including the recent sale of NPC to Fifth Third," which Plaintiffs state occurred in September of 2010. While it seems strange that NPC would continue to make false statements

---

[11]...continue

a new form resets the statute of limitations so as to provide a remedy where a defendant seeks to reach a new audience by republication. *Id.*; Restatement (Second) of Torts § 577A cmt. d (1977).

The republication rule appears to have no application in this case. The complaint alleges that NPC made verbal and written false "statements about BPS to third persons," including to BPS's merchant originators and merchants and to persons at Fifth Third. There is no allegation that NPC published any sort of "mass communication" about BPS. *See In re Davis*, 347 B.R. 607, 611 (W.D.Ky. 2006) (providing as examples of mass communications the "publication of an edition of a book or a periodical, or the broadcast of a single radio or televsion program"). To the extent that NPC made a similar statement at different times to different persons or entities, each separate statement would provide for a separate cause of action. Restatement (Second) of Torts § 577A(1) ("Except as stated in Subsections (2) and (3), each of several communications to a third person by the same defamer is a separate publication."). An illustration of the principle in the Restatement (Second) of Torts is instructive:

> On one occasion A says to B that C is a murderer. On a later occasion A repeats the same statement to B. On a third occasion A makes the same statement to D. Each of the three communications is a separate publication and C has three causes of action against A.

Restatement (Second) of Torts § 577A cmt. a, ill. 1.

[12] Defendants note that in Plaintiffs' first amended complaint, they simply alleged that BPS sold its assets to Merchant Capital in October 2009, without providing the exact date. Defendants argue that "BPS cannot avoid dismissal of its claims by intentionally making its pleadings *more* vague." The court need not directly address this argument because, as stated in the main text, it finds that Plaintiffs sufficiently pled that NPC made defamatory statements about BPS even after the novation.

about BPS even after BPS transferred its assets to Merchant Capital, the court must accept the factual allegations as true for the purposes of considering a motion to dismiss.

Defendants next contend that Plaintiffs' defamation claims are too vague to state a claim. They argue that Plaintiffs failed to allege which individuals at NPC made the allegedly defamatory statements, to whom the statements were communicated or published, when the statements were made, and how they were communicated to any third-parties. However, the court does not find the allegations overly vague. The court instead finds that the allegations satisfy the requirements of Federal Rule of Civil Procedure 8(a)(2), which requires nothing more than "a short and plain statement of the claim showing that the pleader is entitled to relief." Plaintiffs identified the content of the alleged defamatory statements as well as to whom those statements were allegedly made. Specifically, Plaintiffs alleged that NPC made false statements to BPS's merchant originators and merchants regarding BPS's business, such as that BPS was going out of business, was not paying its merchant originators, was not "producing its required minimums," and was not providing proper customer support, and that its merchant accounts were "attriting at an unacceptable rate." Plaintiffs further alleged that NPC told various persons associated with Fifth Third – several of which BPS names in the complaint – that BPS and its principals "could not be trusted, and were liars, cheaters and thieves." Those allegations are sufficient to provide notice of the nature of the defamation claims to Defendants.

Defendants further argue that the defamation claims must be dismissed because Plaintiffs failed to adequately plead that NPC acted with malice. Arguing that the statements NPC allegedly made to the merchant originators and merchants were in regards to BPS's business, and that NPC and the merchants and merchant originators had a business interest in the

- 36 -

substance of the statements, Defendants argue that the statements were subject to a qualified privilege. *See Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 796-797 (Ky. 2004) (stating that where "the communication is one in which the party has an interest and it is made to another having a corresponding interest, the communication is privileged if made in good faith and without actual malice" (internal quotation marks omitted)). Defendants contend that to overcome the privilege, Plaintiffs must allege malice, but that Plaintiffs failed to do so in anything other than a conclusory manner. However, the court finds that, even if NPC is entitled to a qualified privilege for the alleged defamatory statements–a matter the court need not resolve at this time–Plaintiffs' allegations are sufficient. In *Stringer v. Wal-Mart*, the court stated, "While actual malice requires a showing of knowledge of falsity of the defamatory statement or reckless disregard of its truth or falsity, malice can be inferred from the fact of falsity." *Id.* at 799 (internal quotation marks omitted). Thus, the court finds that Plaintiffs' allegation that NPC made false statements, in combination with the allegation that the statements were made maliciously, is sufficient to state a claim.

Finally, Defendants argue that Count 19, the cause of action for "prima facie tort," fails to state a claim. The allegations in the first amended complaint as to this cause of action state that "NPC's publication of false, libelous and defamatory statements, although lawful, was made with the sole intention of inflicting harm upon BPS," and were made "without excuse or justification." Defendants contend that the prima facie tort claim must be dismissed because there was no allegation that NPC owed Plaintiffs any duty outside of the contractual relationship.

However, the court is not convinced that a cause of action for prima facie tort, to the extent such a cause of action exists under Kentucky law, requires a showing of duty. As an initial

matter, the court is unaware of any cases holding that Kentucky recognizes an action for prima facie tort.[13] However, other jurisdictions have recognized such a cause of action as an intentional tort. For instance, in New York, "[t]he elements of prima facie tort are (1) the intentional infliction of harm, (2) which results in special damages, (3) without any excuse or justification, (4) by an act or series of acts that would otherwise be lawful." *T.S. Haulers, Inc. v. Town of Riverhead*, 190 F. Supp. 2d 455, 465 (E.D.N.Y. 2002). The Restatement (Second) of Torts recognizes a similar cause of action: "One who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances. This liability may be imposed although the actor's conduct does not come within a traditional category of tort liability." Restatement (Second) of Torts § 870. In short, to the extent that prima facie tort is a valid cause of action in Kentucky, it appears that it would be premised upon the intentional infliction of an injury, and would not be predicated on the violation of a duty owed by a defendant to a plaintiff. Accordingly, the court will deny Defendants' motion to dismiss that cause of action.

### III

Defendant National Processing Management Company ("National Processing Management") has moved to dismiss with prejudice the claims against it on the basis that it was improperly joined as a party. National Processing Management explains that Plaintiffs incorrectly identified it as the successor to Defendant Iron Triangle. In that regard, National Processing Management provided this court with the summons issued by Plaintiffs for service of the amended complaint; the summons is addressed to "NATIONAL PROCESSING

---

[13] As Defendants have not moved to dismiss the prima facie tort claim on the basis that such an action does not lie under Kentucky law, the court will decline to address that issue at this time.

MANAGEMENT COMPANY, INC., formerly known as IRON TRIANGLE PAYMENT

SYSTEMS, LLC." National Processing Management also submitted a certificate of amendment

to the certificate of formation of Iron Triangle, which states that Iron Triangle changed its name

to "National Processing Holdings, LLC." National Processing Management submits that "in

order to pursue thier claims against Iron Triangle, the Plaintiffs must serve National Processing

Holdings, not National Processing Management." National Processing Management cites

Federal Rule of Civil Procedure 21, which governs misjoinder of parties and provides that a

court may "at any time, on just terms, add or drop a party," as providing authority for the court to

dismiss National Processing Management as a party.

Plaintiffs did not respond to National Processing Management's motion to dismiss. They

thus do not dispute that National Processing Management is not the successor to Iron Triangle.

Accordingly, the court will grant National Processing Management's motion to dismiss as

unopposed, and any claims against National Processing Management will be dismissed with

prejudice.

## IV

In July 2012, while both motions to dismiss addressed above were pending, Defendants

NPC, RPSI, and Fifth Third (collectively "Third-Party Plaintiffs") filed a third-party complaint

against BAMS and Bank of America, N.A. (collectively "Third-Party Defendants"). In the third-

party complaint, Third-Party Plaintiffs brought claims for breach of contract, a declaration of

rights, and an injunction requiring Third-Party Defendants to indemnify them for losses and to

fund the defense of the action. BPS and Merchant Capital have moved to strike that complaint.

First, BPS and Merchant Capital contend that the third-party complaint should be struck on the ground that Defendants did not obtain leave of the court to file the complaint. Under Federal Rule of Civil Procedure 14(a)(1), a defendant is required to obtain leave of court to file a third-party complaint "if it files the third-party complaint more than 14 days after serving its original answer." Here, Third-Party Plaintiffs have not yet filed an answer to BPS and Merchant Capital's complaint. After BPS and Merchant Capital filed their initial complaint, the sole named defendant in that complaint–NPC–filed a motion to dismiss. BPS and Merchant Capital then filed a cross-motion to amend their complaint, which the court granted, while denying as moot the motion to dismiss. Once BPS and Merchant Capital filed their first amended complaint, Third-Party Plaintiffs filed the motion to dismiss for failure to state a claim addressed above. Then, while that motion was pending, Third-Party Plaintiffs filed their third-party complaint. As Third-Party Plaintiffs had not yet filed an answer when they filed the third-party complaint, leave of court to file the third-party complaint was not required.

BPS and Merchant Capital also assert that the third-party complaint must be struck because Third-Party Defendants are not proper parties. However, Rule 14(a)(1) contemplates that a defending party may "serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it." Here, the third-party complaint alleges that Third-Party Defendants may be liable to Third-Party Plaintiffs for part of the claims that BPS and Merchant Capital have brought against Third-Party Plaintiffs. The court does not see how the filing of the third-part complaint at this stage, prior to any discovery having taken place, will prejudice BPS and Merchant Capital. The court notes in that regard that the claims in the third-party complaint relate only to the distribution of liability between Third-Party Plaintiffs and

Third-Party Defendants, and thus will not increase or diminish the amount that BPS and

Merchant Capital can recover in this action. Accordingly, the court will deny BPS and Merchant

Capital's motion to strike.[14]

## V

Having addressed the outstanding motions, the court turns to a discussion of what claims

remain in this case. The following separate parties were named as defendants in Plaintiffs' first

amended complaint: (1) NPC; (2) Iron Triangle; (3) RPSI; (4) GTCR; and (5) Fifth Third. As

discussed above, the motion to dismiss for failure to state a claim was filed by NPC, RPSI, and

Fifth Third. Because neither Iron Triangle nor GTCR has filed a motion to dismiss, all claims

against those two defendants remain pending. Additionally, the claims in the third-party

complaint filed by Defendants NPC, RPSI, and Fifth Third against Third-Party Defendants

BAMS and Bank of America are pending.

As to the Plaintiffs' claims against NPC, RPSI, and Fifth Third, the claims in Counts 1

(for damages) and 11 (for a declaratory judgment) for breach of the marketing agreement based

on the allegation that NPC charged excessive fees to merchants remain pending against those

Defendants, but only to the extent that the claim is based on actions occurring after the effective

date of the August 2009 settlement agreement. Additionally, the claim in Count 3 for breach of

the implied covenant of good faith and fair dealing in connection with the marketing agreement

remains pending against those Defendants. As to the claims in Counts 2, 4, and 12 for breach of

the August 2009 settlement agreement and the implied covenant of good faith and fair dealing in

---

[14] To the extent that BPS and Merchant Capital's motion to strike asserts that the third-party complaint fails to state a claim, the court will decline to rule on that particular issue. As stated in the main text, the third-party complaint will not prejudice BPS and Merchant Capital and they have no interest in the outcome of the claims in the third-party complaint.

connection with the settlement agreement, they remain pending against those Defendants except to the extent that they seek rescission of the settlement agreement. Counts 6 and 7, for tortious interference with various of BPS's contracts and business relationships, also remain pending against NPC, RPSI, and Fifth Third. Finally, the claims in Counts 14, 16, 17, 18, and 19–alleging various defamation-related causes of action–remain pending against those Defendants to the extent that they are based on statements made on or after October 26, 2009, but not based on statements made prior to that date.

## VI

In conclusion, the court will grant in part and deny in part the motion of defendants RPSI and Fifth Third to dismiss the first amended complaint for failure to state a claim. The court will grant the motion of defendant National Processing Management Company to dismiss any and all claims against it. Lastly, the court will deny Plaintiffs' motion to strike the third-party complaint filed by NPC, RPSI and Fifth Third. A separate order will issue in accordance with this opinion.

November 30, 2012

**Charles R. Simpson III, Judge**
**United States District Court**

D03

- 42 -