UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:10-CV-00669-CRS

BUSINESS PAYMENT SYSTEMS, LLC, ET AL.                            PLAINTIFFS

v.

NATIONAL PROCESSING COMPANY, ET AL.                          DEFENDANTS/
                                                        THIRD PARTY PLAINTIFFS

v.

BA MERCHANT SERVICES, LLC, ET. AL.            THIRD PARTY DEFENDANTS

## **MEMORANDUM OPINION**

This matter is before the Court on the following motions:

1) a motion for clarification (DN 127) of our Order dated November 30, 2012 (DN 106) filed by Plaintiffs Business Payment Systems, LLC ("BPS"), and Merchant Capital Portfolios, LLC ("Merchant") (collectively "Plaintiffs");

2) a motion for summary judgment (DN 129) filed by Defendants Fifth Third Processing Solutions, LLC ("Fifth Third"), and National Processing Company ("NPC") (collectively "Defendants");

3) a motion for extension of time (DN 138) to file a response to Defendants' Motion for Summary Judgment filed by Plaintiffs.

For the reasons set forth below, the Court will:

1) grant the motion for clarification;

2) hold the motion for summary judgment in abeyance;

3) deny as moot the motion for extension of time.

## **BACKGROUND**

In 2000, BPS and NPC entered into a Marketing Agreement whereby BPS agreed to serve as an independent sales organizer/member service provider ("ISO/MSP") exclusively

responsible for soliciting customers for NPC's credit and debit card transaction processing business. In the card transaction business, processors such as NPC receive compensation from individual merchants in an amount based on a percentage of all sales processed for each merchant. The percentage rate paid by a merchant—designated the "merchant rate"—is independently negotiated and thus varies as to each individual merchant. Under the Marketing Agreement, BPS was entitled to receive compensation in the form of "residuals" representing the difference between the merchant rate and the percentage rate charged per transaction to BPS. Thus, if the merchant rate charged to a particular merchant was 7 cents per dollar and the rate charged BPS was four cents per dollar, BPS would be entitled to 3 cents per dollar of all transactions processed for that merchant.

In March 2004, Plaintiffs allege that NPC began "systematically withholding Residuals from BPS." (First Amended Complaint, DN 50, at ¶ 68). According to the Complaint, BPS protested the improper withholding of residuals via written and oral communications directed to NPC's officers. In 2004, Bank of America acquired NPC and began operating the company under the name BA Merchant Services ("BAMS"). Even after the acquisition, Plaintiffs allege that BPS continued to protest the improper withholding of residuals. Ultimately, BPS filed a lawsuit against BAMS asserting, *inter alia*, that BAMS breached the Marketing Agreement by failing to pay residuals.

In September 2006, Bank of America sold BAMS to Defendant Iron Triangle Payment Systems LLC ("Iron Triangle"), a subsidiary of Defendant GTCR, LLC ("GTCR") and the "alter-ego" of Defendant RPSI, Inc. ("RPSI"). According to the Complaint, the managers of Iron Triangle were the same managers who were in charge of NPC prior to the Bank of America acquisition. Eventually, Iron Triangle changed the name of the processing company back to

"National Processing Company"—the entity which is presently a defendant in this action. In November 2010—shortly after the filing of the case at bar—NPC was sold to Defendant Fifth Third. Plaintiffs allege that NPC is a "subsidiary division of Fifth Third," and that Fifth Third "has been actively involved in the business, management, supervision, and operations of NPC." (First Amended Complaint, DN 50, at ¶ 4).

After the Iron Triangle acquisition, Plaintiffs allege that NPC was placed on notice of the existence of the BPS-BAMS Lawsuit and knew that BPS could potentially raise similar claims against NPC. With this knowledge, Plaintiffs allege that NPC entered an agreement with BPS to avoid being joined as a defendant in the BPS-BAMS lawsuit. Among other things, the agreement required NPC to "negotiate in good faith over NPC's alleged improper grabs and other improper withholding of Residuals from BPS on an ongoing basis." (First Amended Complaint, DN 50, at ¶ 112). According to Plaintiffs, however, NPC never entered into good faith negotiations nor otherwise cured its alleged breaches of the Marketing Agreement.

In August 2009, NPC filed a lawsuit against BPS in the Western District of Kentucky[1] in an effort to preemptively resolve their dispute relating to the Marketing Agreement. Ultimately, the parties reached a Settlement Agreement which provided, *inter alia*, that BPS would attempt to sell its rights under the Marketing Agreement to a third-party and that NPC would not exercise its contractual "right of first refusal" for any prospective purchaser for 60 days. Furthermore, the Settlement Agreement required NPC to engage in good faith negotiations with BPS to resolve any revisions to the Marketing Agreement that a prospective purchaser might request, and likewise prohibited NPC from unreasonably withholding its consent to any such revisions. In addition, NPC was required to pay BPS the full amount of residuals for July, August, and September 2009.

---

[1] The case (3:09-CV-00566) was assigned to the Honorable John G. Heyburn, II.

In their Complaint in the case at bar, Plaintiffs allege that NPC breached the August 2009 settlement agreement in several ways. In particular, Plaintiffs allege that NPC: 1) acted in bad faith to prevent a prospective sale from closing; 2) "shorted BPS its share of Residuals" for July, August, and September 2009 by "concoct[ing] a ridiculous excuse that blamed the economy for the missing payments;" 3) withheld historical residual data from prospective purchasers despite repeated requests for the information; and 4) unreasonably withheld its consent to modifications of the marketing agreement that were requested by BPS and its prospective purchasers. According to Plaintiffs, these breaches resulted in prospective buyers declining to make offers to purchase BPS, ultimately forcing BPS to accept a less favorable offer from Merchant in October 2009.

Based on the above-detailed allegations, BPS filed the present lawsuit asserting, *inter alia*, the following causes of action:

> 1) Count 1: breach of the Marketing Agreement based on NPC's alleged failure to make residual payments as required thereunder.
>
> 2) Count 2: breach of the Settlement Agreement based on NPC's alleged failure to make residual payments for July, August, and September 2009.
>
> 3) Count 3: breach of NPC's implied covenant of good faith and fair dealing with respect to the Marketing Agreement.
>
> 4) Count 4: breach of NPC's implied covenant of good faith and fair dealing with respect to the Settlement Agreement.

(First Amended Complaint, DN 50, at ¶¶ 28–31).

On November 4, 2011, Defendants filed a motion to dismiss (DN 55) for failure to state a claim upon which relief can be granted. In our Memorandum Opinion (DN 105) (the "Opinion") and Order (DN 106) (the "Order") dated December 3, 2012 (collectively the "Opinion and Order"), we granted the motion to dismiss in part, holding that:

> 1) Count 1 must be dismissed because BPS failed to provide NPC notice of its underpayment of residuals as required by the Marketing Agreement;
>
> 2) Counts 2 and 4 must be dismissed to the extent they sought rescission of the Settlement Agreement because rescission was no longer appropriate in light of BPS's subsequent sale of its assets to Merchant; and
>
> 3) Count 3 was not subject to dismissal because it was not released by the Settlement Agreement.

(Opinion, DN 105, at 12–25).

Shortly after we issued the Opinion and Order, on March 13, 2013, the parties convened with Magistrate Judge Whalin for a Rule 16 scheduling conference. During the conference, Plaintiffs expressed their intent to conduct discovery related to their claims for residuals. In response, Defendants argued that residuals were not a proper subject of discovery because all of Plaintiffs' claims for residuals had been dismissed. Ultimately, Judge Whalin ordered that "discovery shall not include residuals until the parties receive clarification of Judge Simpson's Memorandum Opinion entered on December 3, 2013." (Scheduling Order, DN 118, at ¶ 3).

Subsequently, on January 23, 2014, Plaintiffs filed a motion for clarification (DN 127) of the Opinion and Order. Specifically, Plaintiffs requested that we clarify whether Counts 2, 3, and 4 of Plaintiff's Amended Complaint were dismissed to the extent they seek damages for unpaid residuals.

On February 12, 2014, Defendants filed a motion for summary judgment (DN 129) arguing that Plaintiffs' remaining claims presented no genuine issue of material fact.[2] In response, Plaintiffs filed a motion for extension of time to file a response to the motion for summary judgment (DN 138) on the grounds that a ruling on their motion for clarification and

---

[2] Importantly, the motion for summary judgment does not address Plaintiffs' claims for residuals because Defendants plan on "filing a separate motion for summary judgment as to any revived claims for underpayment of residuals in accordance with future scheduling orders" in the event the Court concludes that Plaintiffs' claims for residuals survived dismissal.

5

further discovery related to residuals were necessary in order to fully respond. Having yet to receive a ruling on the motion for extension, on April 10, 2014, Plaintiffs filed an "Initial Response" to the motion for summary judgment (DN 140) wherein they do not substantively respond to Defendants' arguments but instead merely reiterate their request for additional time to respond.

Having considered the parties' briefs and being otherwise sufficiently advised, the Court will now address the motions submitted for decision.

## STANDARD

Before granting a motion for summary judgment, the Court must find that there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The party moving for summary judgment bears the initial burden of establishing the nonexistence of any issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), a burden which may only be satisfied by "citing to particular parts of materials in the record..." or "showing that the materials cited do not establish the absence or presence of a genuine dispute." FED. R. CIV. P. 56(c)(1). If the moving party satisfies this burden, the burden of production shifts to the non-moving party, who must then identify evidence demonstrating the existence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 322.

In resolving a motion for summary judgment, the Court must view the evidence in a light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for

the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). If the non-moving party fails to satisfy its burden of counterproduction, the court must grant the motion for summary judgment.

Pursuant to FED. R. CIV. P. 56(e), "If a party fails… to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it; or (4) issue any other appropriate order."

## DISCUSSION

*i. Motion for Clarification*

Plaintiffs have requested that we clarify whether the Opinion and Order dismissed Counts 2, 3, and 4 of Plaintiff's Amended Complaint to the extent they seek damages for unpaid residuals. According to Plaintiffs, their claims for residuals survived dismissal because Counts 2 and 4 were dismissed only to the extent that they sought rescission of the Settlement Agreement, while Count 3 was not dismissed at all. According to Defendants, however, such an interpretation is inconsistent with the rationale set forth in the Opinion and therefore could not have been intended by the Court.

Count 1 of Plaintiffs' Amended Complaint requests damages based on NPC's alleged failure to make residual payments pursuant to the Marketing Agreement. In the Opinion, we granted Defendants' Motion to Dismiss Count 1 based on our conclusion that BPS had failed to provide NPC notice of its underpayment of residuals as required by the Marketing Agreement. Although Plaintiffs thus concede that residuals are no longer recoverable under Count 1, they maintain that they may still recover residuals based on their claim in Count 3 that NPC breached

7

its implied covenant of good faith and fair dealing with respect to the Marketing Agreement. In response, Defendants cite the general rule that "[t]he obligation of good faith cannot be employed… to override express contract terms." *Cook v. Little Caesar Enterprises, Inc.*, 210 F.3d 653, 657 (6th Cir. 2000). According to Defendants, because the Court concluded that BPS could not recover residuals due to its failure to comply with an express term of the Marketing Agreement, Plaintiffs cannot now recover the same residuals based on an implied covenant theory. In reply, Plaintiffs argue that this general rule is inapposite because their implied covenant claim is based not on the terms of the Marketing Agreement itself, but rather on NPC's bad faith conduct in preventing BPS from fulfilling the notice requirement by intentionally concealing its underpayment.

After careful review, the Court concludes that BPS's claim for residuals may properly be pursued based on an implied covenant theory. Under Kentucky law, "the implied covenant of good faith and fair dealing prohibits a party from preventing the occurrence of a condition that would otherwise cause payment to become due under the contract." *See Odem Realty Co. v. Dyer*, 45 S.W.2d 838, 840 (Ky. 1932). Thus, by alleging that NPC prevented its performance of the notice requirement in bad faith, BPS has sufficiently stated an implied covenant claim which is separate and apart from its underlying breach of contract claim. Because residuals may yet be recovered on the basis of NPC's alleged breach of its implied covenant of good faith and fair dealing, the Court concludes that BPS's claim for residuals under Count 3 survived the motion to dismiss and is therefore a proper subject of discovery.

Count 2 of Plaintiff's Amended Complaint requests damages based on NPC's alleged breach of the August 2009 Settlement Agreement.[3] Specifically, Plaintiffs seek damages arising from, *inter alia*, Defendants' failure to comply with Paragraph 4's requirement that "NPC… pay BPS the full amount of residuals for credit card processing activity in July 2009, August 2009, and September 2009…" (Settlement Agreement, DN 20-6, at ¶ 4). According to Plaintiffs, because we dismissed Count 2 only to the extent it sought rescission of the Settlement Agreement, their claim for damages based on NPC's alleged nonpayment of residuals survived dismissal.

Defendants counter by characterizing Plaintiffs' right to residual payments under the Settlement Agreement as being nothing more than a restatement of its previously existing right to residual payments under the Marketing Agreement. According to Defendants, the sole purpose of the language relied on by Plaintiffs was to make clear that the residual payments for these months would be with "no set-off for the Shortfall Payment as defined in Paragraph 4 of Amendment #7 to the Marketing Agreement." (Settlement Agreement, DN 20-6, at ¶ 4).[4] As explained by Defendants in their brief, "The Settlement Agreement… did not create any independent obligation for NPC to pay residuals to BPS…," but rather "deferred to the Marketing Agreement." (Resp. to Mot. for Clarification, DN 130, at 9). According to Defendants, because the Court dismissed Plaintiffs' claim for unpaid residual payments based on the Marketing Agreement, it would have been contradictory to allow essentially the same claim to survive dismissal merely because it had been repackaged as a claim for damages under the Settlement Agreement.

---

[3] In the Opinion, we granted Defendants' Motion to Dismiss Count 2 in part on the grounds that rescission of the Settlement Agreement was no longer appropriate in light of BPS's subsequent sale of its assets, but specifically stated that Plaintiffs' claim for damages survived dismissal.

[4] As we explained in the Opinion, the Shortfall Payment consisted of a penalty charged to BPS in the event that it failed to meet its monthly quota for new merchants.

After careful review, the Court concludes that the plain language of the Settlement Agreement belies the contention that the right to residual payments created therein is merely duplicative of the right to residual payments stemming from the Marketing Agreement. As a whole, Paragraph 4 reads:

> In order to (a) facilitate the Prospective Transaction, (b) maintain the NPC-BPS merchant portfolio prior to the closing the Prospective Transaction…, (c) to insure timely payment to all of BPS' [sic] sales representatives, sales groups, referral partners or other individuals, entities, or organizations…, and (d) to provide for RBL loan payments under the Tri-Party Agreement, prior to the closing of the Prospective Transaction, NPC agrees to pay BPS the full amount of residuals for credit card processing activity in July 2009, August 2009 and September 2009… (with no set-off- for the Shortfall Payment as defined in Paragraph 4 of Amendment # 7 of the Marketing Agreement…)

(Settlement Agreement, DN 20-6, at ¶ 4). Importantly, nowhere is this paragraph is there the qualification that BPS's right to residual payments thereunder is derivative of or otherwise dependent upon the terms or conditions of the Marketing Agreement. Furthermore, none of the enumerated purposes of Paragraph 4—namely, to facilitate the Prospective Transaction, to maintain the NPC-BPS merchant portfolio prior to the closing the Prospective Transaction, to insure timely payment to all of BPS' associates, and to provide for RBL loan payments under the Tri-Party Agreement—reflect that such was the intent of the parties. Finally, the mere fact that the Settlement Agreement contains other references to the Marketing Agreement is wholly irrelevant given that a primary purpose of the Settlement Agreement was to resolve the parties' relative rights and obligations under the Marketing Agreement. For these reasons, the Court cannot accept Defendants' contention that BPS's right to residual payments under the Settlement Agreement is merely duplicative of its right to residual payments under the Marketing Agreement. Accordingly, the Court concludes that Plaintiffs may yet recover residuals for July,

August, and September 2009 under Count 2, and that these damages are therefore a proper subject of discovery.

The Court must finally consider whether Plaintiffs' claim for residuals under Count 4 likewise survived dismissal. Count 4 requests damages based on NPC's alleged breach of its implied covenant of good faith and fair dealing with respect to the Settlement Agreement. Because Defendants do not separately argue that Plaintiffs cannot pursue residuals under Count 4, but instead rely exclusively on the arguments they advance with respect to Count 2, the Court concludes that Plaintiffs' claim for residuals under Count 4 likewise survived dismissal.

Having clarified all issues raised in Plaintiffs' Motion for Clarification, the Court will now address the motion for summary judgment.

*ii. Motion for Summary Judgment*

The Court must next address the motion for summary judgment filed by Defendants. FED. R. CIV. P. 56(e) provides that "If a party fails… to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order." Here, because Plaintiffs have yet to substantively respond to the assertions of fact made by Defendants in their motion for summary judgment, the Court will hold the motion for summary judgment in abeyance for 30 days pending the receipt of Plaintiffs' response thereto. If Plaintiffs believe that they need more than 30 days to prepare their response, they may file an affidavit or declaration in accordance with FED. R. CIV. P. 56(d) setting forth the reasons that they "cannot present facts

11

essential to justify its opposition." Upon receipt of Plaintiff's response, Defendants will be granted an additional period of time within which to file their reply, if they choose to do so.

*iii. Motion for Extension of Time*

The Court must finally address Plaintiffs' Motion for Extension of Time (DN 138) to file a response to Defendants' Motion for Summary Judgment. Because the motion for summary judgment will be held in abeyance pending receipt of Plaintiff's response thereto, the motion for extension of time will be denied as moot.

A separate order will be entered in accordance with this opinion.

**Charles R. Simpson III, Senior Judge**
**United States District Court**

August 22, 2014